UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

DOUGLAS R. HILL                                                          PLAINTIFF

v.                                                      CIVIL ACTION NO. 3:13-CV-317-DW

CAROLYN W. COLVIN, Acting Commissioner of Social Security                  DEFENDANT

**MEMORANDUM OPINION**

    Plaintiff Douglas R. Hill has filed a complaint pursuant to 42 U.S.C. §405(g) to obtain

judicial review of a final decision of the Commissioner of Social Security that denied his

applications for disability insurance benefits (DIB) and supplemental security income (SSI). Hill

applied for DIB and SSI on July 8, 2011, alleging that he was disabled as of April 24, 2011, due

to severe degenerative disk disease, obesity, anxiety, depression, obsessive-compulsive disorder

(OCD) and bipolar disorder (Tr. 13-14). The Commissioner denied Hill's claims on initial

consideration (Tr. 102-117, 120-134) and on reconsideration (Tr. 162-164, 165-167). Hill

requested a hearing before an Administrative Law Judge (ALJ) (Tr. 7).

    ALJ George A. Jacobs conducted a hearing in Louisville, Kentucky, on October 12, 2012

(Tr. 52-84). Hill attended with his attorney, Trevor Smith (Tr. 52). Hill and vocational expert

(VE) Tina Stambaugh testified at the hearing (Tr. 56-78, 78-84). Following the conclusion of the

hearing, ALJ Jacobs entered a hearing decision on Oct. 25, 2012, that found Hill is not disabled

for the purposes of the Social Security Act (Tr. 11-22).

    In his adverse decision, ALJ Jacobs made the following findings:

    1.    The claimant meets the insured status requirements of the Social Security Act
          through March 31, 2014.

    2.    The claimant has not engaged in substantial gainful activity since April 24, 2011,
          the alleged onset date (20 C.F.R. 404.1571, *et seq.* and 416.971, *et seq.*).

3.      The claimant has the following severe impairments: degenerative disk disease of the lumbar spine, obesity, anxiety, depression, obsessive/compulsive disorder and bipolar disorder (20 C.F.R. 404.1520(c) and 416.920(c)).

4.      The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.      After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 C.F.R. 404.1567(b) and 416.967(b), except that he must have the option to sit or stand throughout the workday while maintaining at least 30 minutes in a position; he cannot climb ladders, ropes or scaffolds but can occasionally perform other postural activities; he cannot push or pull using the lower extremities; and he should avoid humidity, vibration, temperature extremes and hazards such as machinery and heights.  He can perform only simple, repetitive tasks that involve no contact with the general public and no more than occasional contact with co-workers and supervisors.

6.      The claimant is unable to perform any past relevant work (20 C.F.R. 404.1565 and 416.965).

7.      The claimant was born on May 10, 1960, and was 50-years-old, which is defined as an individual closely approaching advanced age on the alleged disability onset date (20 C.F.R. 404.1563 and 416.963).

8.      The claimant has at least a high-school education and is able to communicate in English (20 C.F.R. 404.1564 and 416.964).

9.      Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferrable job skills (See SSR 82-41 and 20 C.F.R. Part 404, Subpart P, App. 2).

10.     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 C.F.R. 404.1569, 404.1569(a), 416.969 and 416.969(a)).

11.     The claimant has not been under a disability, as defined in the Social Security Act, from Feb. 24, 2011, through the date of this decision (20 C.F.R. 404.1520(g) and 416.920(g)).

(Tr. 13-22).  Hill sought review of the hearing decision by the Appeals Council (Tr. 7).  The

Appeals Council denied his request for review, finding no reason under the Rules to review ALJ

Jacobs' decision (Tr. 1-4).  The present lawsuit followed.


*Background Information.*

Examination of the hearing testimony and medical record reveals the following material

facts.  The Plaintiff, Douglas R. Hill, was born May 10, 1960 (Tr. 57).  At the time of the

hearing, he was 52 years old with a high school education and prior military service in the Army

as a canon crewman (Tr. 59, 181, 212).  Hill stands 6' tall and weighed 240 lbs. at the time of the

hearing (Tr. 60).

Hill testified that he has not worked since his alleged onset date of April 24, 2011 (Tr.

60).  Prior to that time, he had an extensive work history that included at least 10 prior jobs over

a 15-year time period (Tr. 212).  Among these various jobs, Hill identified past relevant work as

a machine operator, a forklift driver, a banquet waiter, a die changer, a welder, a machine

operator, a meat cutter, a cook, and a general construction laborer (Id.).  Hill reported that while

in high school he had vocational training in welding (Tr. 59).  He also related prior employment

at a printing company and at a sanitation company during his consultative psychological

examination by Jessica Hewett, Psy.D., (Tr. 414).

During the hearing, Hill testified to a medical history that included a gunshot wound in

the hip he received in 1992, when a family member shot him. The bullet ricocheted injuring his

bowels (Tr. 61-62, 75-76, 419).  This gunshot injury required Hill to undergo multiple colostomy

surgeries that resulted in some loss of his colon (Tr. 419).  As a result, Hill now suffers from

"dumping syndrome," a bowel condition that requires him to defecate five or six times during the

day (Tr. 76). Despite this problem, however, Hill did not attribute it as being the cause of any loss of employment during the years that he worked multiple jobs from 1976 to 2011 (Id.).

Hill also testified during the administrative hearing to a history of low back pain (Tr. 61-64, 70, 74-75). Hill explained that x-ray examination of his back had confirmed the presence of degenerative disk disease in his lower back(Tr. 74). He estimated that as a result of his ongoing back pain he can only stand or sit for 10-15 minutes at a time and probably walk 2-3 blocks before he has to stop (Tr. 75). Hill wears a back brace daily in an effort to alleviate his constant pain, which he rates as being at a level 8 on a 1-10 pain scale (Tr. 61-62, 75). Hill, a recovering drug and alcohol addict, who had been sober for over a year at the time of the hearing, does not use narcotic medication for back pain relief (Tr. 62).

During a consultative physical examination by Dr. Mark Carter on Oct. 15, 2011 (Tr. 419-423), Hill related a history of low back pain since the gunshot incident in 1992. He described the pain a radiating down the front of his right leg to his foot without numbness (Tr. 419). Hill advised Dr. Carter, and similarly testified, that he could lift approximately 25 lbs., but his back pain prohibited him from repeatedly lifting 30 lbs. (Tr. 63-64, 419). Examination by Dr. Carter revealed Hill to have normal station and gait with no findings of radiculopathy or significant limitations in range of motion (Tr. 420-421). Examination of a prior lumbar spine x-ray confirmed the presence of moderate-to-marked disk space narrowing at the L5-S1 with mild anterior and mild-to-moderate posterior hypertrophic changes, but no scoliosis or spondylolisthesis (Id.). Hill exhibited negative straight leg raise testing and normal extremity strength and deep tendon reflexes despite marked degenerative disk disease at the L5-S1 (Tr. 422). Dr. Carter concluded, based upon his physical examination, that Hill remained able to "tolerate at least light work activity and occasional bending to lift and carry 30 lbs." (Tr. 423).

Aside from Hill's physical problems, he testified at the hearing to a number of emotional problems that affect his ability to work (Tr. 65-66, 71-74, 77). Hill explained that he suffers from manic depression and previously has been hospitalized for emotional problems on approximately five prior occasions (Tr. 65). At the time of the hearing, Hill was receiving counseling twice a month from Donna Ward, an APRN, at the Phoenix Health Center (Tr. 65-66, 286-299, 300-340, 343-370, 371-385, 386-404, 469-485). Review of Hill's prior medical records confirms his repeated prior hospitalizations at Ten Broeck Hospital for treatment of drug and alcohol abuse in 2000, 2002 and 2006 (Tr. 286-299, 300-340, 341-42, 343-370). Hill also received inpatient treatment at the Clark Memorial Hospital in Jeffersonville, Indiana, for substance abuse in 2009 and 2011 (Tr. 371-385, 386-404). Hill reported being sober and free from illegal drug or alcohol use for over a year at the time of the administrative hearing on Oct. 12, 2012. He now attends AA and NA meetings three or more times a week (Tr. 70).

Hill testified at length concerning the nature of his mental health problems and his ongoing treatment at the Phoenix Health Center (Tr. 71-74). The Phoenix Health Center is an indigent care center that is the primary health care provider for the homeless in Louisville, Kentucky (Tr. 72). Hill is treated at the Phoenix Health Center for both his physical and mental conditions (Id.). Hill has been diagnosed by nurse Ward at the Phoenix Center with Bi-polar Disorder, PTSD, anxiety and OCD. (Tr. 425-465, 469-485).

At the hearing, Hill related his obsessive-compulsive disorder symptoms. As he explained it, he is obsessed with cleanliness of both his apartment and of his person (Tr. 72-74). His OCD compels him to perform certain rituals repeatedly (Tr. 72). For example, upon taking a shower Hill must lay out his clothes in a specific order and carefully inspect each item of clothing to make absolutely sure that it has no spots or stains on it (Id.). If any article of clothing

5

has a spot, Hill will begin the entire ritual all over again from the start, using completely new clothes (Id.). According to him, this ritual, which can take several hours, keeps him in the house when he needs to be elsewhere and has made him late for appointments (Tr. 72-73). The Phoenix Hill treatment notes of Donna Ward, APRN, contain repeated observations of Hill's OCD behaviors, including his obsession with cleanliness (Tr. 431-435, 442, 444, 446, 471, 474, 477, 481).

Examination of the Phoenix Hill treatment notes shows that APRN Ward initially diagnosed Hill in 2011 with bipolar disorder, PTSD, and OCD traits, "especially compulsions." (Tr. 431). As Hill explained to Ward during one examination on July 25, 2011, he washes his clothes repeatedly and cleans his shoe laces over and over again (Tr. 446). Hill on that occasion despite his statements nevertheless denied any obsessions (Id.). Yet, when he returned to the Phoenix Center the following month on Aug. 8, 2011, Hill reported that his OCD symptoms - - ordering, arranging, cleaning and washing his clothes over and over again, showed little improvement following his treatment with Celexa (Tr. 444). As Hill was quoted to state on that occasion, "I have to do it." (Id.).

Hill did not notice any decrease in his obsessions or compulsions when he reported to nurse Ward on Sept. 13, 2011 (Tr. 442). Hill explained to Ward at the time that it was "going to take a while" for him to get over his compulsions and obsessions (Id.). By November of 2011, Hill did report that his OCD symptoms had improved, but were still present (Tr. 435). Hill continued to improve and by Nov. 30, 2011, was reported to be clinically stable, although he was several hours late for his morning appointment that day (Tr. 431). APRN Ward continued to assess Hill with a guarded prognosis and a GAF score of 50 (Id.).

By the spring of 2012, on April 9, 2012, APRN Ward continued to indicate in her treatment notes that Hill "has marked symptoms of OCD and also has obsessions." (Tr. 481). Her diagnosis on that occasion indicates "OCD, especially compulsions are marked." (Id.). The following month on May 7, 2012, Hill reported to Ward that he was not isolating himself as much and was able to talk to people more, but "the cleaning is still the same." In Hill's words, "I can tell if someone has moved something, automatically so I have to pull everything out and straighten it all out again. [It] takes hours to get ready." (Tr. 477).

Ward's treatment notes from that date continue to indicate that Hill "lays out everything in a certain order - - irons all clothes, etc. - - has to start over if interrupted." (Id.) Ward adds that Hill reported to her that his "foods cannot touch each other" and he has "lost jobs secondary to … having to start tasks over" and that "others in the family and at [the homeless] shelter complained." (Tr. 477). Hill was treated at the Phoenix Health Center with 11 different medications for his physical and mental problems (Tr 483).[1] The medications apparently provided little relief for the above described OCD symptoms, however.

On May 25, 2012, psychiatric nurse practitioner Ward completed a medical source statement of Hill's ability to do work-related activities (mental) (Tr. 466-467). Nurse Ward based her medical source statement on prior psychiatric assessments, interviews and hospital records and Hill's self-reports (Tr. 467). As support for her assessment of Hill's ability to do work-related activities, Nurse Ward wrote on the assessment form that Hill "suffers from marked OCD which greatly affects his ability to perform tasks. His bipolar disorder causes mood fluctuations and irritability." (Tr. 467). As a result, Nurse Ward concluded that Hill had no

---

[1]  His medications include Cetrizine, Accupril, HCTZ, Ibuprofin, Cyclodenzaprine, Amitriptyline, Cardura, Benzonatate, Meloxicam and Bacflofen (Tr. 483).

useful ability, or in other words "poor" ability to: carry out detailed instructions; maintain attention and concentration for extended periods; perform activities within a schedule; maintain regular attendance and be punctual; sustain ordinary routine without supervision; work with or near others without being distracted; make simple work-related decisions; complete a normal workday or workweek; perform at a consistent pace; interact appropriately with the public; accept instructions and respond appropriately to criticism from supervisors; get along with co-workers and peers; maintain socially appropriate behavior; respond appropriately to changes in the work setting; be aware of normal hazards and take appropriate precautions; travel in unfamiliar places or use public transportation; and set realistic goals or make plans independently of others (Tr. 466-67). Nurse Ward found that Hill had good ability and could satisfactorily remember locations and word procedures, understand short, simple instructions, carry out those instructions, and adhere to basic standards of neatness and cleanliness. (Id.).

Dr. Jessica Hewett in her consultative psychological examination of Oct. 3, 2011, likewise assessed Hill with significant limitations based upon his mood disorder (Tr. 413-16). In her report, Dr. Hewett found that Hill's ability to understand, remember and carry out simple instructions on the performance of a repetitive task had slight limitations based on Hill's impairments (Tr. 416). Dr. Hewett, however, found moderate-to-marked limitations in Hill's ability to tolerate stress and pressures of day-to-day employment and in his ability to respond appropriately to supervision, co-workers and work pressures in a work setting (Id.). The doctor found Hill to be moderately limited based on his impairments in his ability to sustain attention and concentration towards the performance of simple tasks (Id.). In her capacity statement, Dr. Hewett indicated that if Hill were to be awarded benefits he could not manage them adequately

in his own best interest (Id.). In her view, Hill's prognosis for improvement in his mental health was fair, assuming appropriate mental health intervention (Tr. 417).

ALJ Jacobs in his hearing decision at p 10 rejected the assessment of consultative psychological examiner Dr. Hewett (Tr 20). He did so based on the conclusion that Dr. Hewett's assessment was based on a one-time interview performed without the opportunity to review Hill's behavioral health records "showing improvement in the claimant's mood, stability and interpersonal functioning with treatment." (Id.). ALJ Jacobs also noted that the GAF scores assigned by Dr. Hewett were "inconsistent with the marked degree of impairment." (Id.).

The hearing decision then continues immediately thereafter to reject the medical source statement of nurse Ward (Tr. 20, 466-467). ALJ Jacobs explains in this regard that:

> For similar reasons, the undersigned finds the assessment prepared by the claimant's nurse practitioner to be unpersuasive (Ex. 13G). Her assessment is inconsistent with her own records regarding the claimant's response to treatment. For example, she opines that the claimant is unable to work partly because he suffers from psychosis, whereas her treatment records indicate that the claimant has consistently denied psychotic symptoms when he is taking his medication. Likewise, she says that he is limited by mood fluctuations and irritability, even though the claimant generally presents with euthymic mood, he has reported that he is less irritable and socially isolated, and his moods are repeatedly described as stable. She also relies heavily on the claimant's reports that he has lost multiple jobs prior to the alleged onset date. As noted above, his behavior during this period is not indicative of his ability to function with appropriate mental health treatment and abstinence from drugs and alcohol (Ex. 12F, 13F, 14F). The nurse's assessment is inconsistent with the weight of the evidence and thus given little weight.

(DN 20). Accordingly, ALJ Jacobs concluded in his hearing decision that Hill retains the residual functional capacity to perform a limited range of light work that, and as to his nonexertional impairments, is limited to "simple, repetitive tasks that involve no contact with the general public and no more than occasional contact with co-workers and supervisors." (Tr. 16).

**The Five-Step Sequential Evaluation Process.**

Disability is defined by law as being the inability to do substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of not less than 12 months.  See, 20 CFR §§ 404.1505, 416.905(a).  To determine whether a claimant for DIB or SSI benefits satisfies such definition, a 5-step evaluation process has been developed.  20 CFR §§ 404.1520, 916.920(a).  At step 1, the Commissioner must determine whether the claimant is currently engaged in substantial gainful activity; if so, the Commissioner will find the claimant to be not disabled.  See, 20 CFR §§ 404.1520(a)(4)(i), 416.920(a)(4)(ii), 416.971.  *See, Dinkel v. Secretary*, 910 F2d, 315, 318 (6th Cir. 1990).

If the claimant is not working, then the Commissioner next must determine at step 2 of the evaluation process whether the claimant has a severe impairment or combination of severe impairments that significantly limit his or her ability to perform basic work activities.  See 20 CFR §§ 404.1520(a)(4)(ii),  416.920(a)(4)(ii).  If the impairments of the claimant are determined by the Commissioner to be non-severe, in other words, so slight that they could not result in a finding of disability irrespective of a claimant's vocational factors, then the claimant will be determined to be not disabled at step 2.  *See, Higgs v. Bowen*, 880 F.2d 960, 962 (6th Cir. 1988); *Mowery v. Heckler*, 771 F.2d 966, 971-72 (6th Cir. 1985).

If the claimant has a severe impairment or impairments, then the Commissioner at step 3 of the process will determine whether such impairments are sufficiently serious to satisfy the listing of impairments found in Appendix 1 of Subpart B of Part 404 of the federal regulations.  20 CFR §§ 404.1520(A)(4)(iii), 416.920(a)(4)(iii) The claimant will be determined to be

automatically disabled without consideration of his or her age, education or work experience if the claimant's impairments are sufficiently severe to meet or equal the criteria of any impairment listed in the Appendix. *See, Lankford v. Sullivan*, 942 F.2d 301, 306 (6th Cir. 1991); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).

When the severity of the claimant's impairments does not meet or equal the listings, then the Commissioner must determine at step 4 whether the claimant retains the residual functional capacity (RFC) given his or her impairments to permit a return to any of his or her past relevant work. 20 CFR §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv). *See, Smith v. Secretary*, 893 F.2d 106, 109-110 (6th Cir. 1989). A claimant who retains the residual functional capacity, despite his or her severe impairments, to perform past relevant work is not disabled. 20 CFR §§ 404.1560(b)(3), 416.960(b)(3) The burden switches to the Commissioner at step 5 of the sequential evaluation process to establish that the claimant, who cannot return to his or her past relevant work, remains capable of performing alternative work in the national economy given his or her residual functional capacity, age, education and past relevant work experience. See, 20 CFR §§ 404.1520(a)(4)(v), 404.1560( c ), 416.920(a)(4)(v), 416.960( c ); *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994); *Herr v. Commissioner*, 203 F.3d 388, 391 (6th Cir. 1999). Collectively, the above disability evaluation analysis is commonly referred to as the "5-step sequential evaluation process."

**Standard of Review.**

Review of a decision of the Commissioner is governed by 42 U.S.C. § 405(g). The statute, and case law that interprets it, require a reviewing court to affirm the findings of the Commissioner if they are supported by substantial evidence and the Commissioner has employed

the appropriate legal standard. *Walters v. Commissioner of Social Security*, 127 F.3d 525, 528 (6th Cir. 1997) ("This Court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.). Substantial evidence is defined by the Supreme Court to be "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401 (1971). *See also, Lashley v. Sec'y of HHS*, 708 F.2d 1048, 1053 (6th Cir. 1983) (citing *Perales*). It is more than a mere scintilla of evidence or evidence that merely creates the suspicion of the existence of a fact, but must be enough evidence to justify a refusal to direct a verdict if the matter were tried to a jury. *Sias v. Sec'y of HHS*, 861 F.2d 475, 479 n. 1 (6th Cir. 1988).

The substantiality of the evidence is to be determined based upon a review of the record taken as a whole, not simply some evidence, but rather the entirety of the record to include those portions that detract from its weight. *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984); *Laskowski v. Apfel*, 100 F. Supp.2d 474, 482 (E.D. Mich. 2000). So long as the decision of the Commissioner is supported by substantial evidence, it must be upheld by the federal court even if the record might support a contrary conclusion. *Smith v. Sec'y of HHS*, 893 F.2d 106, 108 (6th Cir. 1989). The substantial evidence standard "presupposes that there is a zone of choice within which decision makers can go either way, without interference from the courts." *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (*en banc*).

**Issues for Review.**

Hill challenges the factual and legal adequacy of findings 4, 5, 9, 10 and 11 in his fact and law summary (DN 12). With respect to finding no. 4, he argues that ALJ Jacobs failed to

consider the combination of all his physical and mental problems at step 3 of the sequential evaluation process contrary to the teachings of *Blankenship v. Bowen*, 874 F.2d 1116, 1123 (6th Cir. 1989) and *Lankford v. Sullivan*, 942 F.2d 301, 306 (6th Cir. 1991).  More specifically, Hill argues that, while ALJ Jacobs made a passing reference to his consideration of the severity of Hill's mental impairments in reaching his adverse conclusion that such impairments did not medically equal or meet the criteria of Listings 12.04 and 12.06, ALJ Jacobs did not state "that he considered in combination the specific physical and mental impairments he found in Finding No. 3."  (DN 12, F&LS p. 2).  Hill accordingly concludes that it was error for ALJ Jacobs to fail to evaluate the combined effects of his exertional and nonexertional impairments (Id.).

Hill contends that ALJ Jacobs focused exclusively on Hill's physical limitations without giving adequate consideration to Hill's OCD and its pervasive effects on his behavior as noted by Hill's treating therapist Nurse Ward.  In particular, Hill argues that ALJ Jacobs' conclusion that Hill's persistence and pace is only moderately affected by his mental health symptoms "has no support in the record."  (DN 12, F&LS p. 2).  Hill points out that the activities of daily living cited in this portion of ALJ Jacobs' opinion at p. 5 (Tr. 15), *i.e.*, the ability to use the computer, make phone calls and attend meetings, does not address the effect of Hill's severe OCD-based rituals and how they would interfere with his ability to maintain persistence and pace (DN 12, F&LS p. 3).  Hill additionally points out that ALJ Jacobs' conclusion that he is able to manage his own money is contradicted by the very exhibit, Ex. 6E, cited by the ALJ, which on its face states that Hill has trouble controlling his spending (Tr. 254).

Hill then turns to finding of fact no. 5 of ALJ Jacobs' hearing decision, the RFC finding (DN 12, F&LS pp. 3-9).  Hill maintains that ALJ Jacobs in this finding failed to properly evaluate the evidence relating to Hill's activities of daily living, the frequency and intensity of

13

his combined physical and psychological symptoms, the factors that aggravate and precipitate these symptoms and medication that Hill takes to deal with them. See 20 C.F.R. §§ 404.1529 and 416.929(c); SSR 96-4p and 96-7p. He likewise argues that ALJ Jacobs did not properly evaluate the consultative examination reports of Drs. Hewett and Carter, as well as, the opinion evidence of APRN Ward contrary to 20 C.F.R. §§404.1527 and 416.927, along with SSR 96-2p, 96-5p, 96-6p and 06-3p.

The "most significant error" according to Hill occurred in ALJ Jacobs' evaluation of Hill's psychological symptoms, in particular, his obsessive-compulsive disorder. Hill challenges ALJ Jacobs' conclusions that his treatment records "reflect significant improvement in his psychiatric symptoms with appropriate mental health treatment and abstinence from drugs and alcohol." (Tr. 19). As proof that ALJ Jacobs excluded his OCD-related symptoms from consideration, Hill points to that portion of the hearing decision at which ALJ Jacobs wrote:

> His behavior health consultant notes that he still struggles with compulsive
> behavior and that his rituals sometimes affect his ability to get things
> done. Otherwise, his symptoms appear to be relatively well controlled.

(Tr. 19).

Hill explains that the use of the term "otherwise" confirms that ALJ Jacobs excluded the OCD symptoms from those being characterized as "well controlled." (DN 12, F&LS p. 4). Hill continues to challenge the finding that while he reported that it sometimes takes him hours to get ready to go out due to his OCD rituals, "he is still able to attend meetings, medical appointments, counseling sessions and church services." (Tr. 19). Hill insists that this quoted statement confuses mere attendance with timely attendance, which is not indicated in the record. Further, ALJ Jacobs cites no facts or other portions of the record that would support the ALJ's conclusion

that Hill's rituals do not make him late and do not interfere with his persistence and pace. Hill maintains that this is so because "no facts in evidence … contradict [his] … testimony that the rituals make him late or that [he] … does not perform the repetitive activities he described." (DN 12, F&LS p. 4). Hill notes in this regard that VE Stambaugh testified that if the limitations imposed by Nurse Ward in her mental RFC assessment form were adopted, then Hill would be precluded from all substantial gainful activity by his inability to maintain attention and concentration, inability to maintain consistent pace, complete a normal workday and take instructions from supervisors. (Tr. 83-84).

Hill maintains that nowhere in the hearing decision does ALJ Jacobs point to any specific treatment record that confirms that Hill's severe OCD-related limitations have improved. Instead, according to Hill, ALJ Jacobs merely "lumped" together Hill's OCD symptoms with those of his depressive disorder symptomology (DN 12, F&LS p. 5). The record in Hill's view is quite clear and specific that his OCD obsessive compulsive behaviors, such as having to repeatedly set out his clothing in a specific order and ensure that it is spotless, have adversely affected his ability to timely attend various functions outside the home (Tr. 72-73). Hill insists in this regard that his hearing testimony is entirely consistent with the medical treatment findings obtained from the Phoenix Health Center. Yet, this particular issue was not developed by cross-examination from ALJ Jacobs at the hearing (Id.).

Hill concludes that only one treatment note in the entire record suggests any improvement, marginal or otherwise, in his OCD symptoms. That treatment noted dated Nov. 1, 2011, indicates only that Hill advised he experienced some improvement with Lexipro, but his OCD symptoms were still present (Tr. 435). This singular observation, according to Hill, simply is not vocationally significant when one examines the remainder of the Phoenix Health Center

mental health treatment notes, which indicate that "the OCD is still there," and that Hill reported being "stuck deciding what to wear." (Tr. 471).

Even with treatment with Paxil, Hill continued to note that although the medication helped, his OCD symptoms remain "very prominent." (Tr. 474). On that occasion, Nurse Ward, as Hill notes, observed his extreme neatness/cleanliness and referred to Hill's "many rituals, etc." (Id.). Hill also points out the quoted passage from his May 7, 2012 examination by Nurse Ward during which he related, as noted above, if anyone moves anything Hill will have to pull everything out, straighten it all again and start all over (Tr. 477). These statements as reflected in the treatment notes of Nurse Ward, according to Hill, are entirely supportive of his statements that he is frequently late for meetings and appointments due to his obsessive/compulsive rituals.

Hill insists that his testimony and statements to nurse Ward are uncontradicted in the record and raise a serious issue of whether he can consistently perform any job for an 8-hour workday on a weekly and yearly basis. This open question, in Hill's view, remains unresolved by the reports of the state agency reviewing doctors on which ALJ Jacobs relied in his hearing decision. Hill maintains that the conclusions of the state agency reviewing psychologist were not entitled to any significant weight by ALJ Jacobs because the non-examining psychologist failed to provide a rationale as to why "the specific and detailed findings of the treating therapist [Nurse Ward] with regard to [Hill's] … OCD symptomology [were] … not entitled to weight with regard to the severity of Hill's condition." (DN 12, F&S pp. 6-7).

In short, Hill asserts that the state agency doctors did not evaluate the notes of his treating or examining sources, much less explain any conflicts between their conclusions and those of the treating sources. Hill consequently concludes that substantial evidence simply does not support ALJ Jacobs' RFC finding in finding of fact no. 5, nor does the record in any fashion

conflict with Hill's testimony that his compulsive/obsessive rituals make him late "all the time." (Tr. 72-73). Likewise, nothing in the record indicates any significant improvement in Hill's OCD symptoms and the ALJ's reliance upon Hill's activities of daily living as evidence of his alleged ability to persist on task establishes no basis in fact that a reasonable person could rely upon to reach such a conclusion. In other words, merely because Hill is able to go to the library, to the homeless center or ride a bus at times of his own choosing, does not show, and supports no factual inference, that he can adequately maintain persistence and pace during the workday so as to perform the alternative substantial gainful activity identified by the VE during the hearing of Oct. 12, 2012.

Hill raises various other arguments, albeit in less depth, in his fact and law summary (DN 12, F&LS pp. 8-10). For example, he maintains that the ALJ applied different standards to the medical evidence that supports his adverse decision than the standard applied to that evidence which contracts it (Id.). The ALJ supposedly disparaged the conclusions of the consultative psychological examiner Dr. Hewett, with the observation that the doctor gave a one-time examination, but nevertheless gave significant weight to the conclusions of one-time examining consultant Dr. Carter. The same is true of the ALJ's observation that Dr. Hewett did not have the opportunity to see all of the medical records indicating Hill's improvement, but made no mention of this same limitation with respect to the consultative physical examination results.

Further, Hill notes that the ALJ failed to consider stress as a limitation, as determined by Dr. Hewett in her report (Tr.416). While the regulations require that all the relevant evidence be considered, Hill insists that ALJ Jacobs' RFC determination at finding no. 5 makes no mention of Hill's limitation due to stress even though the ALJ specifically found that Hill's does not cope well with stress (Tr. 16). Finally, Hill observes that while ALJ Jacobs found that Nurse Ward's

assessment was inconsistent with her treatment records, the ALJ did not identify any specific inconsistencies with respect to Hill's severe OCD-related symptoms. Instead, Hill contends that ALJ Jacobs apparently concluded by implication, that OCD is not a psychosis, a severe mental disorder. This conclusion, however is based only on that portion of the hearing decision in which ALJ Jacobs cites Nurse Ward's opinion that Hill is unable to work due in part because he suffers from psychosis as being inconsistent with her treatment records, which "indicate that the claimant has consistently denied psychotic symptoms when taking his medication." (Tr. 20). Hill responds that an objective review of the Phoenix Health Center treatment records shows this statement to be false as the records show in great detail his severe OCD rituals and the decided lack of improvement even with treatment (DN 12, p. 10).

*Listing of Impairments.*

The first question for the Court to address is whether ALJ Jacobs erred at step 3 of the sequential evaluation process when he determined that none of Hill's severe mental impairments "considered singly or in combination, do not meet or medically equal the criteria of Listings 12.04 and 12.06." (Tr. 15). Hill, as noted, complains that ALJ Jacobs did not consider all of his severe impairments in combination in considering whether the paragraph B criteria of the above listings were satisfied.

At step three, a claimant will be considered to be disabled if his impairment meets or equals one of the listings of impairments found in 20 C.F.R. Part 404, Subpart P, App. 1. *McClellan v. Astrue*, 804 F. Supp.2 d 678 (E.D. Tenn. 2011). The burden falls on the claimant to prove every element of the applicable listing. *King v. Sec'y of H&HS*, 742 F.2d 968, 974 (6th Cir. 1986). When the claimant presents evidence of an impairment that meets or equals all of

the requirements for a particular listed impairment, along with the 12-month duration requirement, a finding of disability is required without regard to the claimant's age, education or work history. *Lankford v. Sullivan*, 942 F.2d 301, 306 (6th Cir. 1991); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990); *see also, Sullivan v. Zebley*, 493 U.S. 521, 531-33 (1990) ("The Secretary [now Commissioner] explicitly has set the medical criteria defining the listing impairments at a higher level of severity than the statutory standard. The listings define impairments that would prevent an adult, regardless of his age, education, or work experience, from performing *any* gainful activity, not just 'substantial gainful activity.'") (citing 20 C.F.R. §416.925(a)(1989)); *Bowen v. City of New York*, 476 U.S. 467, 471 (1986) ("If a claimant's condition meets or equals the listed impairments, he is conclusively presumed to be disabled and entitled to benefits; if not, the process moves to the fourth step").

An impairment or combination of impairments will be deemed medically equivalent to a listed impairment if the symptoms, signs and laboratory findings demonstrated by the medical evidence are equivalent in severity and duration to that of a listed impairment. *See Land v. Sec'y of H&HS*, 814 F.2d 241, 245 (6th Cir. 1986) (citing 20 C.F.R. §1526(b)). A decision of medical equivalency, however, must be based solely on medical evidence supported by acceptable clinical and diagnostic techniques. *Id.* Finally, an ALJ is not required by Sixth Circuit case law to individually discuss each element of the record when considering the listings so long as the ALJ demonstrates that he has considered the totality of the record. *Rosic v. Comm'r of Soc. Security*, 2010 WL 3292964 at *3 (N.D. Ohio Aug. 19, 2010) (citing *Gooch v. Sec'y of H&HS*, 833 F.2d 589, 591 (6th Cir. 1987)).

Because the listings establish a presumption of disability without consideration of a claimant's age, education or work experience, and represent an automatic "screening in" based

only on a claimant's medical findings, the claimant must meet the strict evidentiary standard described above. *Zebley*, 493 U.S at 532.

Here, the Commissioner correctly observes that the hearing decision of ALJ Jacobs makes express reference to the consideration of the "combination of impairments" in concluding that such impairments do not meet or medically equal the severity of any of the listed impairments in 20 C.F.R. Part 404, Subpart P, App. 1. See 20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926. This statement by ALJ Jacobs does appear under the existing case law of the Sixth Circuit to satisfy the regulatory requirement that he consider all of Hill's impairments in combination at step 3 of the evaluation process.

The cited case law provided by the Commissioner at p. 4 of her fact and law summary indicates that such a reference to "a combination of impairments" by the ALJ in the hearing decision is sufficient to satisfy the requirement. *See Gooch v. Sec'y of HHS*, 833 F.2d 589, 591-92 (6th Cir. 1987), *cert. denied*, 484 U.S. 1075 (1988); *Loy v. Sec'y of HHS*, 901 F.2d 1306, 1310 (6th Cir. 1990)("An ALJ's individual discussion of multiple impairments does not imply that he failed to consider the effect of the impairments in combination where the ALJ specifically refers to a 'combination of impairments' in finding that the plaintiff does not meet the listings."). Accordingly, the Court is compelled to reject Hill's initial argument with respect to finding no. 4 of the hearing decision.

### *Residual Functional Capacity*

The next matter to be resolved is ALJ Jacob's consideration of the impact of Hill's severe OCD on his ability to maintain persistence and pace. The Commissioner in her fact and law summary characterizes Hill's argument in this respect as an attack on the credibility finding of

ALJ Jacobs.  If that were so, the Commissioner would be fully persuasive in her argument that the credibility determinations of an ALJ are accorded great weight by the federal courts.

An administrative law judge properly may consider the credibility of a claimant when evaluating the claimant's subjective complaints, and the federal courts will accord "great deference to that credibility determination."  *Warner v. Comm'r*, 375 F.3d 387, 392 (6th Cir. 2004).  The standard in the Sixth Circuit for evaluating subjective complaints, such as complaints of pain for example, was established in *Duncan v. Sec'y of H&HS*, 801 F.2d 847, 853 (6th Cir. 1986).  *See Buxton v. Halter*, 246 F.3d 762, 773 (6th Cir. 2001) (setting forth the *Duncan* standard).

Under *Duncan*, the Court first determines whether objective medical evidence of an underlying medical condition is present in the record.  *Id*.  If so, then the Court will examine whether such evidence confirms the severity of the claimant's subjective symptoms related to the condition, or whether the objectively established medical condition itself is of sufficient severity that it can be reasonably expected to produce the alleged subjective symptoms, such as disabling pain.  *Id*.  The findings of the ALJ in this regard are repeatedly held in the Sixth Circuit to be accorded great weight and deference given the ability of the ALJ to observe the demeanor and credibility of the witnesses.  *Walters v. Comm'r*, 127 F.2d 525, 531 (6th Cir. 1997) (citing *Villarreal v. Sec'y*, 818 F.2d 461, 463 (6th Cir. 1987)).  Yet, the ALJ is not accorded absolute deference and his or her assessment of a claimant's credibility must be supported by substantial evidence.  *Beavers v. Sec'y*, 577 F.2d 383, 386-87 (6th Cir. 1978).

When the ALJ "finds contradictions among the medical reports, claimant's testimony and other evidence," the ALJ may properly discount the credibility of the claimant.  *Winning v. Comm'r*, 661 F. Supp.2d 807, 822 (N.D. Ohio 2009) (citing *Walters*, 127 F.3d 525, 531 (6th Cir.

1997)).  The ALJ, however, is not permitted to render a credibility determination based solely upon a hunch, or "intangible or intuitive notion about an individual's credibility."  *Id*. (citing *Rogers*, 486 F.3d at 247) (citing SSR 96-7p)).  Under SSR 96-7p, the ALJ must in the hearing decision set forth specific reasons for the credibility determination sufficient to make clear to the claimant and subsequent reviewers the weight that the ALJ gave to the claimant's statements and the reasons for such weight.  *Winning*, 661 F. Supp.2d at 823.  A mere blanket assertion that a claimant is not believable will not be sufficient under SSR 96-7p.  *Id*. (citing *Rogers*, 486 F.3d at 248).

An assessment of the claimant's credibility must be based on a consideration of all the evidence of record.  It should include consideration of not only the objective medical evidence but the following factors as well: (1) the daily activities of the claimant; (2) the location, duration, frequency, and intensity of the claimant's symptoms including pain; (3) any factors that precipitate or aggravate the symptoms; (4) the dosage, type, effectiveness and side effects of any medication taken to alleviate such symptoms or pain; (5) treatment that the claimant has received for relief of his or her symptoms; (6) any measures other than treatment that the claimant uses to relieve his or her symptoms; and (7) any other factors relating to the functional limitations and restrictions of the claimant due to such symptoms or pain.  *Id*. at 823 n. 14 (citing SSR 96-7p).  Also included among the evidence that the ALJ must consider are the medical signs and laboratory findings of record, the diagnosis, prognosis and medical opinions provided by any treating physicians or other medical sources, and any statements or reports from the claimant, physicians or other persons about the claimant's medical history, treatment, response to treatment, prior work record, daily activities and other information related to the symptoms of the claimant and how such symptoms affect his or her ability to work.  *Id*.

When the record establishes consistency between the subjective complaints of the claimant and the other evidence of record, such consistency will tend to support the credibility of claimant, while in contrast, any inconsistency in this regard will tend to have the opposite effect. *Winning*, 661 F. Supp.2d at 823.  The reviewing court does not make its own credibility determinations.  *Franson v. Comm'r*, 556 F. Supp.2d 716, 726-27 (W.D. Mich. 2008) (citing *Walters*, 127 F.3d at 528)).  The federal courts will not substitute their own credibility determination for that of the ALJ as the fundamental task of the Commissioner is to "resolve conflicts in the evidence and to decide questions of credibility."  *Rineholt v. Astrue*, 617 F. Supp.2d 733, 742 (E.D. Tenn. 2009) (citing *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994)).  Given the substantial deference accorded the credibility determination of the Commissioner, "'claimants challenging the ALJ's credibility determination face an uphill battle.'"  *Franson*, 556 F. Supp.2d at 726-27 (citing *Daniels v. Comm'r*, 152 Fed. Appx. 485, 488 (6th Cir. 2005)).

Here, Hill's argument is more elaborate than a mere challenge to ALJ Jacobs' credibility determination.  Hill instead focuses on the failure of the ALJ to adequately consider his well-documented OCD condition and its impact on his ability to maintain persistence and pace in an employment environment.  In other words, Hill maintains that this severe condition, while acknowledged by the ALJ, was not adequately developed in the record of the administrative proceedings, particularly given the consistent nature of Hill's unmitigated OCD rituals as discussed above.

The Court is compelled to agree with Hill in this regard.  The record is not adequately developed.  Hill's OCD-related rituals and symptoms are both consistent and reoccurring throughout the treatment notes made by APRN Ward.  She notes on repeated occasions the

severe effects of these rituals, which can take hours and involve repeatedly arranging, and cleaning items of clothing and items in Hill's apartment. Hill consistently related to Ward that these rituals are resistant to psychotropic medication and that they regularly cause him difficulty with timely attending to matters outside his apartment. Indeed, nurse Ward's own treatment notes directly reflect that Hill was several hours late to his therapy appointment on at least one occasion. The obsessive/compulsive rituals apparently were so noteworthy that other residents of the homeless shelter and members of Hill's family complained about them.

Further, the mental RFC assessment of nurse Ward cannot be fairly characterized as a mere checkbox exercise devoid of any substantial support in the record. Psychiatric nurse Ward provided treatment for Hill's bipolar disorder, anxiety, OCD and PTSD for well over a year prior to completing the mental RFC assessment form on May 25, 2012 (Tr. 466-67). On the face of the form, Ward indicates that it is based on prior psychiatric assessments, interviews, hospital records and the patient's reports (Tr. 467). Those reports, as noted by the Court, are internally consistent and reflect severe OCD-related limitations that went largely unexplored by the ALJ during the administrative hearing and in his hearing decision.

The hearing decision itself claims that nurse Ward's mental RFC assessment "is inconsistent with her own records regarding the claimant's response to treatment." (Tr. 20). If that is so, the hearing decision provides no examples of such inconsistencies and the Court fails to find any such inconsistencies upon review of the record. Certainly, Hill did not deny the existence of his OCD, itself a form of psychosis, and the debilitating impact that it had upon his ability to timely complete routine activities that would directly affect his persistence and pace. As for Hill's statements regarding the beneficial effects of his various psychotropic medications, his statements all appear to run to the effects on his bipolar disorder and anxiety disorder.

Accordingly, at least to the extent of Hill's severe OCD symptoms, the Court fails to appreciate how nurse Ward's "assessment is inconsistent with the weight of the evidence and thus given little weight." (Tr. 20).

Indeed, one can reasonably conclude that nurse Ward's RFC assessment is supported by the consultative psychological examination results obtained by Dr. Hewett, at least to the extent that the doctor finds Hill to be moderate-to-markedly impaired in his ability to tolerate stress and pressures of day-to-day employment and to respond appropriately to supervision, co-workers and work pressures in a work setting (Tr. 416). While the ALJ dismisses these conclusions of the consultative psychological examiner, based on her one-time examination, one might just as easily argue that these examination results, which were based upon an examination that occurred on Oct. 3, 2011, *prior* to the receipt of Hill's Phoenix Center mental health treatment notes from 2012, and nurse Ward's May 25, 2012 mental RFC assessment, actually ***understate*** the nonexertional limitations of the claimant.

Further, the psychological consultative examination report does not dwell, or even mention, Hill's severe OCD condition, which in itself would suggest that further examination is necessarily required in order to adequately develop the true extent of his limitations in this regard. In sum, the Court is unable to find the inconsistencies that ALJ Jacobs relies upon in his hearing decision to reject the conclusions of Hill's treating psychiatric nurse and Hill's own testimony, as well as the conclusions of the consultative psychological examiner. Perhaps, with further development and additional findings, the Court will agree that substantial evidence does support the hearing decision in this regard. At present, the Court simply cannot adequately determine from the record as it now exists that substantial evidence in fact supports the Commissioner's decision in step 5 of the sequential evaluation process. Accordingly, the Court

shall remand the case pursuant to sentence 4 of 42 U.S.C. §405(g) for further proceedings in accordance with the opinion of the Court so that adequate development of Hill's OCD condition and its impact on his ability to engage in substantial gainful activity can be had.

Cc:     Counsel of Record